**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Sho Jay MATSUMARU, Defendant–Appellant.**

**No. 99–10334.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 13, 2000

Filed April 3, 2001

accrual of a claim under *Kubrick* and *Rosales*.

William L. Osterhoudt, Law Offices of William L. Osterhoudt, San Francisco, California, for the defendant-appellant.

Omer G. Poirier, United States Attorney's Office, Honolulu, Hawaii, for the plaintiff-appellee.

Before: HUG, Chief Judge, TROTT, and WARDLAW, Circuit Judges.

TROTT, Circuit Judge:

It's been said that "good counsellors lack no clients." WILLIAM SHAKESPEARE, MEASURE FOR MEASURE act I, sc.2. Sho Jay Matsumaru certainly did not lack clients, but according to the government, it was not because he was a "good counsellor." To the contrary, the government characterizes Matsumaru as a cunning, sophisticated lawyer engaged in a complex, multi-layered criminal scheme designed to defraud his clients and the United States government.

The prosecution pieced together the acts of Matsumaru's tragic play during a week-long trial, featuring over twenty-five witnesses. The denouement came when a jury convicted the protagonist, Matsumaru, of two counts of wire fraud, two counts of visa fraud, and one count of establishing a commercial enterprise for the purpose of evading immigration laws. The district court closed the script by sentencing Matsumaru to five concurrent forty-one month sentences and by ordering him to pay $50,000 in restitution.

Not content with his fate, Matsumaru appealed his convictions and sentence. We have jurisdiction of this sequel under 28 U.S.C. § 1291. As discussed in detail below, we affirm four of Matsumaru's five convictions, and affirm his sentence, except with respect to the amount of restitution ordered by the district court. Accordingly, we affirm in part, reverse in part, and remand the case to the district court for the limited purpose of calculating the amount of restitution Matsumaru must pay.

## I

### Background

#### 1. The Scheme

Matsumaru is a Japanese citizen who has been a permanent resident of the United States since 1984. In addition to speaking both Japanese and English, Matsumaru is a licensed attorney who practiced law in Hawaii from 1988 until the time of his conviction in 1999. Among other disciplines, Matsumaru helped Japanese clients obtain visas from the United States government. He bragged that he had almost a 100% success rate in securing visas for his clients.

The government surmised that Matsumaru's success rate was a function of an elaborate, multi-faceted strategy devised to defraud the United States government, and at the same time, to swindle his unwitting foreign clients. First, Matsumaru advertised in a Japanese language publication as a bilingual immigration attorney capable of helping Japanese citizens obtain visas from the United States Department of State ("State Department"). Japanese citizens desirous of living in the United States who saw Matsumaru's advertisement contacted him. Matsumaru explained that in order to qualify for a particular visa, a Japanese citizen must invest a substantial sum of money in a United States company. To effectuate the investment, Matsumaru instructed the Japanese citizens to wire money from their Japanese bank accounts to newly formed corporate bank accounts in Hawaii. Instead of using these funds to invest in United States companies, however, Matsumaru, without authorization, diverted most of the money to his own personal uses.

Then, after creating the paper trail supposedly demonstrating his clients' investments in viable United States companies, Matsumaru endeavored to secure visas for his clients. He prepared application materials for his clients to submit to the United States consulate in Japan. In these materials, Matsumaru made several false representations to the United States government about the history of his clients' investments and about the formation of their United States enterprises. Relying on these false representations, the government granted visas to Matsumaru's clients.

#### 2. The Clients

Several clients sought Matsumaru's legal assistance in securing visas that would

allow them to live in the United States. Matsumaru's representation of three clients in particular—Yasutsugu Wada ("Wada"), Kimio Murakami ("Murakami"), and Shinji Tsutsumi ("Tsutsumi")—gives rise to the instant case.

### a. Yasutsugu Wada

After seeing Matsumaru's advertisement in a Japanese publication, Wada contacted the immigration attorney, expressing his desire to live in the United States. Because Wada's previous application for a student visa had been denied, Matsumaru knew that the United States government would be reluctant to grant Wada a permanent visa. Matsumaru suggested that Wada first try to obtain a treaty investor visa, known as an "E–2 visa," [1] which would allow him to stay temporarily in the United States. If successful in obtaining a temporary treaty investor visa, Wada should then try to secure a visa that would allow him to stay permanently in the United States.

Wada hired Matsumaru to help him obtain both visas, and they entered into a two-part written agreement setting forth each party's rights and responsibilities. Wada paid Matsumaru $10,000 to help him obtain the E–2 treaty investor visa. If the government denied Wada's petition for a treaty investor visa, Matsumaru agreed to reimburse the $10,000 fee, less expenses. But, if Wada was successful in obtaining a temporary treaty investor visa and was later able to secure a permanent visa, Wada agreed to pay Matsumaru an additional $10,000 fee.

Matsumaru explained to Wada that in order to qualify as a treaty investor, he had to invest a substantial sum of money in a United States company. Wada agreed to establish a new United States company named Paradise Corporation. Per Matsumaru's instructions, Wada wired $650,000 from his bank in Japan to a newly formed Paradise Corporation bank account in Hawaii on which both Wada and Matsumaru were signatories. According to their arrangement, Matsumaru was the sole manager of Paradise Corporation, and Wada contractually agreed "not [to] interfere with the business matters at all."

Once Wada wired the $650,000 into the Paradise Corporation bank account, Matsumaru diverted a substantial portion of those funds for personal uses. For instance, Matsumaru deposited a $370,000 Paradise Corporation check, denominated as a loan, into his personal account at another bank. Wada testified that he never authorized any "loan" to Matsumaru, much less a loan for $370,000. Moreover, Matsumaru used corporate funds to pay directly for personal debts and services, including physical therapy, massages, guitar lessons, and alimony to his ex-wife.

With a paper trail supposedly evidencing Wada's investment, Matsumaru turned his attention toward securing Wada a treaty investor visa. He prepared a packet of materials for Wada to submit to the United States consulate in Japan. As part of the packet, Matsumaru wrote a letter describing Wada and the creation of Paradise Corporation. In this letter, Matsumaru made two allegedly false statements: (1) that Wada was a qualified treaty investor when, in fact, Wada was not a qualified treaty investor because he had contractually ceded all managerial responsibilities over Paradise Corporation to Matsumaru; and (2) that Paradise Corporation had purchased a travel company, known as Pacific Hawaiian Travel, for $239,000, when, in fact, Paradise Corporation had not done so. The United States government granted Wada's E–2 visa petition.

1. An E–2 treaty investor visa is available to citizens of certain foreign countries, including Japan, who come to the United States "solely to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing a substantial amount of capital." 8 U.S.C. § 1101(a)(15)(E)(ii). This provision comprises the heart of Matsumaru's first two claims on appeal and is discussed in detail in Section II.1.b., *infra.*

The jury convicted Matsumaru of (1) committing wire fraud against Wada in violation of 18 U.S.C. § 1343 and (2) committing visa fraud against the United States in violation of 18 U.S.C. § 1546.

### b. Kimio Murakami

Murakami also saw Matsumaru's advertisement and contacted him seeking legal assistance in obtaining an E–2 treaty investor visa. Matsumaru told Murakami that he had to make a substantial investment in a United States corporation in order to qualify for a treaty investor visa and suggested that Murakami start a golf tour business called Jin Golf. Murakami agreed, wrote a $50,000 check to create Jin Golf, and, per Matsumaru's instructions, wired $200,000 from his bank in Japan to Jin Golf's corporate account in Hawaii.

To get Jin Golf rolling, Matsumaru convinced Murakami to pay $50,000 for Big Golf, an existing golf tour company owned by one of Matsumaru's former clients. Matsumaru drew up the sales agreement, Murakami signed the agreement, and Murakami's wife wrote a check, denominated as a "van purchase," on the Jin Golf account for $50,000. Instead of getting the entire Big Golf company, however, Murakami received only one van and one business license.

At trial, Kusuo Urahama, the owner of Big Golf and a former client of Matsumaru's, testified that he had already sold Big Golf to another man, and therefore could not have sold it to Murakami. Urahama also explained that he never received any part of Jin Golf's $50,000 check. In fact, Matsumaru deposited the $50,000 check into a bank account of which Urahama was wholly unaware.

2. The government charged Matsumaru with visa fraud for allegedly making false statements to the United States government in connection with Murakami's treaty investor visa petition. The jury acquitted Matsumaru of this charge.

3. The government also charged Matsumaru with committing wire fraud against Tsutsumi,

The jury convicted Matsumaru of committing wire fraud against Murakami in violation of 18 U.S.C. § 1343.[2]

### c. Shinji Tsutsumi

Like Wada and Murakami, Tsutsumi also saw Matsumaru's advertisement in a Japanese publication and contacted him seeking legal assistance in obtaining a treaty investor visa. Matsumaru told Tsutumi that he had to make a substantial investment in a United States corporation in order to qualify as a treaty investor. Matsumaru convinced Tsutsumi to invest in Paradise Resorts, a company previously owned by Matsumaru's sister. Per Matsumaru's instructions, Tsutsumi invested $300,000 in Paradise Resorts.

Once Tsutsumi invested in Paradise Resorts, Matsumaru prepared a packet of materials for Tsutsumi to submit to the United States government along with his treaty investor visa petition. As part of the packet, Matsumaru wrote a letter describing Tsutsumi and the history of Paradise Resorts. In this letter, Matsumaru made two allegedly false statements: (1) that Paradise Resorts managed several condominium units, when in fact, Paradise Resorts did not manage several condo units; and (2) that Paradise Resorts provided resort-management and travel services, when, in fact, it did not provide those services. The U.S. government granted Tsutsumi's E–2 visa petition.

The jury convicted Matsumaru of committing visa fraud against the United States in violation of 18 U.S.C. § 1546.[3]

## II

### Discussion

Matsumaru challenges his convictions and sentence on six grounds:

but the jury acquitted Matsumaru of this charge. Additionally, the government charged Matsumaru with committing visa fraud against the United States in connection with the treaty investor visa petition of another client, Osamu Masuda, but the jury acquitted Matsumaru of this charge, as well.

1. The superseding indictment misstated the legal requirements for E–2 treaty investor visas.
2. The government compounded the error in the indictment by misstating the requirements for treaty investor visas throughout the trial.
3. The government presented improper lay witness testimony.
4. The district court erred by failing to define "materiality" in its jury instructions.
5. The evidence was insufficient to convict on any of the five counts for which he was found guilty.
6. In determining his sentence under the United States Sentencing Guidelines, the district judge (a) miscalculated the loss Matsumaru caused; (b) mischaracterized his clients as "vulnerable victims"; (c) improperly double-counted enhancements; and (d) neglected to consider relevant factors in ordering Matsumaru to pay $50,000 in restitution.

We address each of Matsumaru's contentions in turn.

## 1. Under the Specific Circumstances of this Case, the Superseding Indictment Did Not Misstate the Legal Requirements for E–2 Treaty Investor Visas.

Matsumaru first argues that the superseding indictment should have been dismissed because it misstated the legal requirements for E–2 treaty investor visas.

### a. Standard of Review

■ Because Matsumaru timely objected to the facial validity of the superseding indictment, our review is *de novo.* *United States v. Fleming,* 215 F.3d 930, 935 (9th Cir.2000); *United States v. Du Bo,* 186 F.3d 1177, 1180 n. 1 (9th Cir.1999).

### b. Analysis

■ The government alleged that Matsumaru falsely stated, among other things, that his clients qualified as treaty investors and were therefore entitled to treaty investor visas. In order to qualify for an E–2 treaty investor visa, a foreign citizen must be entering the United States "solely to *develop and direct* the operations of an enterprise in which he has invested … a substantial amount of capital." 8 U.S.C. § 1101(a)(15)(E)(ii) (West 2000) (emphasis added). The phrase "develop and direct" is not defined in the statute, but the United States Department of State, the agency charged with primary enforcement of the statute, explains the phrase as follows:

> Solely to develop and direct. The business or individual treaty investor does or will develop and direct the enterprise by controlling the enterprise through ownership of at least 50% of the business, by possessing operational control through a managerial position or other corporate device, or by other means.

22 C.F.R. § 41.51(p) (West 2000).

Matsumaru contends that Paragraph 1b of the superseding indictment misstates the legal requirements for E–2 treaty investor visas. Paragraph 1b states: "An E–2 visa is a visa granted to foreign investors who *actively manage* substantial business enterprises in the United States." Emphasizing the disjunctive nature of the regulation, Matsumaru argues that active management is one way to satisfy the "develop and direct" requirement of the statute, but is not the only way. According to him, "[m]ajority ownership of a qualifying business enterprise is … an *independent ground* upon which to satisfy the 'direct and develop' requirement of the statute, regardless of whether the majority investor is personally involved in the management of the business."

Matsumaru points out that Wada was a majority owner in his United States enterprise and thus maintains that Wada was indeed a qualified treaty investor, irrespective of whether he actively managed his enterprise. Because Paragraph 1b mentions only active management and neglects to refer to majority ownership as an alternative way to meet the "develop and direct" requirement, Matsumaru argues that

the indictment invited the grand jury to indict him on the mistaken impression that he lied when he claimed Wada was a qualified treaty investor.[4] If the grand jury had known that majority ownership independently satisfied the "develop and direct" requirement, he contends it would not have indicted him.

We acknowledge that the "active management" phrase of the superseding indictment does not track verbatim the "develop and direct" language of the statute. *See* 8 U.S.C. § 1101(a)(15)(E)(ii). However, under the circumstances of this case, we conclude that the indictment's departure from the "develop and direct" language of the statute does not require dismissal.

■ First, the State Department itself recognizes that, in some cases, majority ownership will not satisfy the "develop and direct" requirement of the statute. Specifically, the State Department explains that "[o]wnership of at least 50 percent of the business will meet the control requirement, *if* the owner retains full rights of control of that portion of the business *and has not assigned them to another.*" 9 Foreign Affairs Manual (F.A.M.) § 41.51 N.11.1 (1993) (emphasis added). Conversely, "[a]n investor, although owning a majority of the shares, may have lost control by pledging stock, giving proxies or surrendering rights by contract." 2 Gordon et al., *Immigration Law and Procedure* § 17.06 (2000). "[W]e must give substantial deference to an agency's interpretation of its own regulations because its expertise makes it well-suited to interpret the language." *Dep't of Health & Human Servs. v. Chater*, 163 F.3d 1129, 1133 (9th Cir.1998) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). "This deference is warranted

all the more when the regulation concerns a complex and highly technical regulatory program, in which the identification and classification of relevant criteria necessarily require significant expertise and entails the exercise of judgment grounded in policy concerns." *Id.* at 1134 (internal quotation omitted). The decision whether to grant a foreign citizen's petition for a treaty investor visa is a complex, fact-specific inquiry requiring experience, expertise, and the exercise of policy judgment.

We find it persuasive that the State Department, in interpreting its own regulation, recognizes that a majority owner who cedes managerial control over his enterprise does not control the business in such a way that he can "develop and direct" it. *See* 9 F.A.M. § 41.51 N.11.1. This precise set of circumstances exists in this case: Wada contractually ceded all managerial control over Paradise Corporation to his lawyer, Matsumaru, and as a result lost the ability to "direct and develop" his enterprise. *See id.*

Furthermore, as the State Department regulations and manual recognize, awarding a treaty investor visa to a foreign citizen based exclusively on majority ownership would, in some cases, contravene the purpose behind the treaty investor visa statute. Congress explained that an E–2 treaty investor visa "is intended to provide for the *temporary admission* of such aliens who will be engaged in developing or directing the operations of a real operating enterprise. . . ." H.R. Rep. No. 82–1365 (1952), U.S.Code Cong. & Admin.News 1952, 1653 (emphasis added). If an investor has no managerial control over the enterprise, the investor's constant physical presence in the United States would be unnecessary, and thus there

---

4. Matsumaru was also convicted of committing visa fraud in connection with Tsutsumi's petition. However, the government did not allege in the indictment or at trial that Matsumaru falsely characterized Tsutsumi as a "qualified treaty investor." Instead, the government alleged that Matsumaru falsely described Tsutsumi's enterprise, Paradise Resorts, as managing several condominium units and providing hotel-resort and travel services, when, in fact, neither was true. Therefore, any alleged error in the indictment concerning whether Matsumaru identified his clients as "qualified treaty investors" is irrelevant to Tsutsumi's petition.

would be no reason to award a treaty investor visa. *See id.* This scenario is starkly presented in Wada's case. Because Wada ceded all managerial control over Paradise Corporation to Matsumaru, there was no need for him to live temporarily in the United States.

We conclude that a majority owner who contractually cedes all managerial control to another loses the ability to "develop and direct" the enterprise, as required by 8 U.S.C. § 1101(a)(15)(E)(ii) and 22 C.F.R. § 41.51(p). *See* 9 F.A.M. § 41.51 N.11.1. By surrendering his right to manage Paradise Corporation, Wada precluded himself from developing and directing his enterprise. Under these specific circumstances, we hold that the superseding indictment's "actively manage" language did not misstate the legal requirements for a treaty investor visa in a way that would compel the district court to dismiss the indictment. However, we do not suggest that the government utilize such loose language in future indictments.

**2. The Government Did Not Present a Legally Erroneous Case to the Jury.**

Matsumaru alleges that the government compounded the error in the indictment by presenting its case to the jury on the "false premise" that a foreign national cannot obtain a treaty investor visa simply through majority ownership of a United States enterprise. For the reasons expressed above, we reject that claim.

**3. The Government Properly Elicited Testimony Regarding Materiality.**

Matsumaru next argues that the government improperly elicited testimony from two lay witnesses about the materiality of Matsumaru's assertions made in support of his clients' treaty investor visa petitions.

**a. Standard of Review**

We review for an abuse of discretion the district court's admission of lay witness testimony. *See United States v. Simas,* 937 F.2d 459, 464 (9th Cir.1991).

**b. Analysis**

Materiality is a requirement of visa fraud, and presents a mixed question of law and fact that must be decided by the jury. *See* 18 U.S.C. § 1546; *United States v. Gaudin,* 515 U.S. 506, 509–11, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). A statement is material if it is capable of affecting or influencing a governmental decision. *See United States v. Serv. Deli Inc.,* 151 F.3d 938, 941 (9th Cir.1998). "The false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material." *Id.* (internal citations omitted). Therefore, in this case, the government was required to prove beyond a reasonable doubt that Matsumaru's statements made in support of his clients' visa petitions could have affected or influenced the government's decision to grant those petitions.

To satisfy its burden, the government called to the witness stand two government officials to discuss what factors are material in determining whether or not to grant immigrant visas. One witness was a centers adjudication officer for the Immigration and Naturalization Service ("INS") and in that capacity "ma[d]e decisions on petitions and applications for aliens seeking benefits into the United States," including E–2 treaty investor visas. The other witness, a State Department official, testified to having personally reviewed between five and six thousand E–2 treaty investor petitions, and was currently the chief of the non-immigrant visa unit in the American Embassy in Tokyo, Japan. However, neither witness actually reviewed Matsumaru's clients' visa petitions when those petitions were originally submitted to the United States consulate in Japan, and the prosecutor did not establish either of them as an expert.

During direct examination, the prosecutor instructed each witness to review the visa petitions along with the supporting materials, and then asked whether knowing certain facts would have affected the

witness's decision to grant or deny the petition. For example, the prosecutor asked the INS centers adjudication officer whether she would have granted Wada's treaty investor petition if she had known that Wada contractually ceded all managerial control over his enterprise, Paradise Corporation, to his lawyer, Matsumaru. The INS officer responded that she would have questioned Wada's petition because "it doesn't appear that Mr. Wada is directing and developing any investment."

In another instance, the prosecutor asked the State Department bureau chief whether he would have granted Tsutsumi's treaty investor petition if he had known that Tsutsumi's enterprise, Paradise Resorts, had no employees and did not manage several condominium units as had been represented in Matsumaru's letter. The State Department bureau chief responded that he would have questioned Tsutsumi's petition because "that doesn't constitute a commercial undertaking which is providing a good service for sale."

Matsumaru challenges the government's presentation on two grounds. First, he argues that because the witnesses were not established as experts and were not the officials who reviewed the petitions when originally submitted, they lacked personal knowledge as required by Federal Rule of Evidence 701. *See* FED. R. EVID. 701. Second, he asserts that the witnesses improperly provided legal conclusions to the jury. We respectfully disagree with both contentions.

Even though the government witnesses were not the officials who reviewed the visa petitions when the petitions were originally submitted to the United States consulate, they did review those documents before stating their opinions to the jury. Therefore, the witnesses' opinions were "rationally based on the[ir] perception" of the documents. FED. R. EVID. 701.

Moreover, the witnesses did not provide impermissible legal conclusions. Rather, in answering the prosecutor's questions, the witnesses explained why knowing certain facts could have affected or influenced their decision to approve the particular visa petition. "Government witnesses are permitted ... to testify as to whether certain truths, if known, would have influenced their decisionmaking...." *United States v. Kingston*, 971 F.2d 481, 486 (10th Cir.1992). This type of lay testimony is entirely proper. If Matsumaru disagreed with the witnesses' testimony, he could have cross-examined the witnesses (which he did), and he could have called his own agency official to rebut the government's witnesses (which he did not).

## 4. The District Court Did Not Err by Failing to Define "Materiality" in Its Jury Instructions.

Matsumaru next claims that the district court erred by failing to define "materiality" in its jury instructions.

### a. Standard of Review

Because Matsumaru did not object to the jury instructions, we review their adequacy for plain error. *United States v. Montgomery*, 150 F.3d 983, 996 (9th Cir.1998). Plain error requires an "(1) error, (2) that is plain, and (3) that affects substantial rights." *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (internal quotations omitted). If these three conditions are met, we may exercise our discretion to notice the error but only if it (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* (internal quotation omitted).

### b. Analysis

Our Circuit has never addressed the question of whether a district court's failure to define "materiality" when instructing the jury constitutes plain error. In the only reported case dealing with the issue, the First Circuit held that " 'materiality' is not such a technical concept outside of the jurors' experience that failure to define it rises to the level of plain error." *United States v. Blasini–Lluberas*, 169 F.3d 57, 67 (1st Cir.1999).

We need not decide whether the failure to define materiality can ever constitute plain error because the court's failure to do so in this case does not warrant reversal. First, the district court properly instructed the jury that materiality is a required element of visa fraud. *Cf. United States v. Uchimura,* 125 F.3d 1282, 1287 (9th Cir.1997) (finding failure to include materiality as an element of offense—a more egregious error than simply failing to define it—did not warrant reversal because of "overwhelming" evidence). Second, the court identified the specific statements Matsumaru made to the United States government that the jury had to find material. Third, the government presented two agency officials who explained precisely how and why Matsumaru's statements were capable of influencing the government's decision to grant or deny his clients' visa petitions. Based on this testimony, the jury was not left completely without guidance as to the meaning of materiality. *See United States v. Santana–Rosa,* 132 F.3d 860, 864–65 (1st Cir. 1998) (holding that failure to define "customs waters" does not warrant reversal because "the jury was not left completely without guidance" based on witnesses' testimony). Fourth, the record contains no evidence that the jury requested a definition of "materiality" or was confused about the term in any way. Finally, the jury acquitted Matsumaru of two counts of visa fraud. Under these circumstances, we need not reach the question of whether this was plain error because the "fairness, integrity, or reputation of the judicial proceedings" is not called into question. As a result, we need not reverse.

**5. The Evidence Was Sufficient to Convict Matsumaru on Four of the Five Counts for Which He Was Found Guilty.**

Matsumaru also contends that the evidence introduced at trial was insufficient to sustain any of his five convictions.

**a. Standard of Review**

In reviewing the sufficiency of evidence after a conviction, we ask whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Chu,* 5 F.3d 1244, 1248 (9th Cir.1993). Under this standard, we conclude that the evidence was sufficient to convict Matsumaru of two counts of wire fraud and two counts of visa fraud, but was not sufficient to convict Matsumaru of establishing a commercial enterprise for the purpose of evading immigration laws in violation of 8 U.S.C. § 1325(d).

**b. Analysis**

**(1) Wire Fraud—Counts 1 & 2**

Title 18 U.S.C. § 1343 provides:
Whoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice [is guilty of wire fraud].

18 U.S.C. § 1343 (2000). Matsumaru was convicted of committing wire fraud against Wada and Murakami. The evidence is sufficient to support both convictions.

With respect to Wada, the government presented evidence that (1) Matsumaru instructed Wada to wire $650,000 from Japan to a corporate bank account in Hawaii; and (2) Matsumaru, without authorization, diverted part of those funds to his own personal bank account and used another part to pay for personal debts and services, including physical therapy, massages, guitar lessons, and alimony to his ex-wife.

With respect to Murakami, the government presented evidence that (1) Matsu-

maru instructed Murakami to wire at least $200,000 from Japan to a corporate bank account in Hawaii; (2) Matsumaru told Murakami that $50,000 of those funds would be used to purchase another company named Big Golf; (3) instead of receiving the entire Big Golf company, Murakami received only one van and one business license; and (4) the owner of Big Golf, Kusuo Urahama, already sold the company to another person and never received any part of Jin Golf's $50,000 payment.

Viewing the evidence presented in a light most favorable to the prosecution, a rational jury could conclude that Matsumaru committed wire fraud against both Wada and Murakami.

### (2) Visa Fraud—Counts 5 & 7

Title 18 U.S.C. § 1546(a) provides in pertinent part:

Whoever ... knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws ... [is guilty of visa fraud].

18 U.S.C. § 1546 (2000). Matsumaru was convicted of two counts of visa fraud against the United States government in connection with the visa petitions of Wada and Tsutsumi. The evidence is sufficient to support both convictions.

The government presented evidence that Matsumaru submitted a letter in support of Wada's visa petition[5] in which he stated that (1) Wada was a qualified treaty investor; and (2) Wada's company, Paradise Corporation, had purchased a travel company for $239,000. Neither statement was true. Wada was not a qualified treaty investor because he had contractually ceded all managerial control of Paradise Corporation to Matsumaru, and therefore was not developing and directing his enterprise as required under the treaty investor statute and regulations. *See* 8 U.S.C. § 1101(a)(15)(E)(ii); 22 C.F.R. § 41.51(p); 9 F.A.M. § 41.51 N.11.1; *see generally* Section II.1.b, *supra.* Furthermore, the government presented evidence that Wada's corporation had not actually purchased the travel company, as Matsumaru had represented. In fact, Matsumaru deposited $238,000 of the $239,000 purported purchase price for the travel company into his personal bank account.

The government also presented evidence that Matsumaru submitted a letter in support of Tsutsumi's visa petition in which he stated that Tsutsumi's company, Paradise Resorts, managed "several condominium units" and provided hotel-resort and travel services. These statements were false. In fact, at that time, Paradise Resorts had no employees, did not manage several condominium units, and did not provide either hotel-resort or travel services. Matsumaru points out that Paradise Resorts is now a flourishing company providing hotel-resort and travel services. Paradise Resorts' current situation, however, is irrelevant to the company's status at the time Matsumaru made representations to the United States government. As explained, when Matsumaru made those statements, they simply were not true.

5. Matsumaru points out that the State Department purges actual visa petitions one year after they are received. Thus, according to Matsumaru, because Wada's and Tsutsumi's actual petitions had been purged, the prosecution failed to prove that Matsumaru's letters (including the false statements) had actually accompanied the petitions. We disagree. First, the consulate certified that Matsumaru's letters were recovered from United States Embassy records abroad. Second, each letter was specifically addressed to the consulate, concerned Matsumaru's clients' treaty investor visa petitions, and was dated near the time each petition had been submitted. Finally, the defense offered no evidence of government spoliation or bad faith. This evidence is sufficient to show that the letters had been submitted to the United States government. *See United States v. Green,* 745 F.2d 1205, 1208 (9th Cir.1984) ("Evidence of routine custom and practice can be sufficient to support the inference that something is mailed."); *United States v. Brackenridge,* 590 F.2d 810, 811 (9th Cir.1979) (holding that circumstantial evidence can support inference of mailing).

Viewing the evidence in a light most favorable to the prosecution, a rational jury could conclude that Matsumaru committed visa fraud against the United States government in connection with the visa petitions of Wada and Tsutsumi.

### (3) Establishing a Commercial Enterprise for the Purpose of Evading Immigration Laws—Count 4

■■■ Title 8 U.S.C. § 1325(d) makes it a crime for a person to "knowingly establish[ ] a commercial enterprise for the purpose of evading any provision of the immigration laws...." 8 U.S.C. § 1325(d) (West 2000). As detailed below, because the government's theory of what constituted "establishing an enterprise" was novel and its evidence was insufficient to sustain a guilty finding, we reverse Matsumaru's conviction on this count.

Before trial, Matsumaru moved to dismiss the indictment because, among other things, the charging document failed to identify the particular commercial enterprise the government claimed had been established for the purpose of evading immigration laws. Was it Paradise Corporation, the school created for Wada; Jin Golf, the golf touring company set up for Murakami; or Paradise Resorts, the resort management company launched for Tsutsumi? When asked to clarify what "enterprise" the government was referring to, the prosecutor surprisingly responded that, "in fact, the commercial enterprise is not one of these entities, but [rather is] Mr. Matsumaru's law practice." By his own words, the prosecutor was required to prove that Matsumaru established his law practice for the purpose of evading immigration laws.[6]

Somewhere during the course of the trial, however, the prosecutor slightly modified the theory. He no longer claimed that Matsumaru established his entire law practice for the purpose of evading immigration laws. Instead, the prosecutor asserted that the enterprise in question was only a portion of Matsumaru's law practice. The district court accepted this theory, and explained to the jury that in order to convict Matsumaru of violating 8 U.S.C. § 1325(d), the government must prove, *inter alia*, that "the defendant S. Jay Matsumaru established a commercial enterprise, to wit, a portion of his law practice, for the purpose of evading provisions of the immigration laws of the United States...." The jury convicted Matsumaru of violating § 1325(d).

Matsumaru claims the government's evidence is insufficient to find him guilty of this charge for several reasons. Because we agree with Matsumaru that the evidence presented by the government at trial failed to prove that he knowingly established his law practice for the purpose of evading immigration laws, we need not address the merits of his other contentions. To establish means "[t]o make or form; to bring about or into existence." BLACK'S LAW DICTIONARY 566 (7th ed.1999); *see also* WORLD BOOK DICTIONARY Vol. I(A–K) 725 (1976) (defining "establish" as "to set up on a firm or lasting basis; ... [to] set up in business ... to bring about"). The district judge properly tracked these definitions when she instructed the jury that " 'To establish' means to bring into being, to found, or to set up."

The government presented no evidence from which a rational trier of fact could find that Matsumaru brought into being, founded, or set up his law practice for the purpose of evading immigration laws. The actions Matsumaru took which were allegedly intended to evade the immigration laws in no way corresponded to the timing of when his law practice was set up. Matsumaru established his law practice in 1988. However, the indictment charged that "[f]rom in or around September, 1992 to the present the Defendant ... knowingly established a commercial enterprise for

---

6. Accordingly, we express no opinion as to whether the government could have proven that Paradise Corporation, Jin Golf, or Paradise Resorts were merely sham enterprises established by Matsumaru for the purpose of evading immigration laws.

the purpose of evading provisions of the immigration law relating to the issuance of E–2 visas. . . .'' The government offered no evidence that in 1988 Matsumaru established his law practice with the intent of evading immigration laws. In fact, at trial the government did not even claim that Matsumaru attempted to evade immigration laws until 1992 when he submitted a false statement in connection with Wada's visa petition. Consequently, by its own charging document and by the evidence it presented, the government demonstrated that Matsumaru set up his law practice in 1988 and first violated immigration laws in 1992, approximately four years later. In light of that time gap, no reasonable jury could conclude that Matsumaru knowingly established his law practice for the purpose of evading immigration laws.

Even if the government was only required to prove that a portion of Matsumaru's law practice was established for the purpose of violating immigration laws, an issue which we need not decide here, the government failed to carry its burden. The government offered no evidence that in 1988 Matsumaru established even a portion of his law practice for the purpose of evading immigration laws. At trial, the government proved that Matsumaru submitted two false visa petitions to the United States on behalf of his clients. The fact that Matsumaru submitted two false statements to the United States over the course of approximately eight years is insufficient to support a conviction for establishing an enterprise within the meaning of § 1325.

Accordingly, because the evidence was insufficient to sustain the jury's guilty verdict against Matsumaru for violating 8 U.S.C. § 1325(d), we reverse his conviction on that count. Our reversal of Matsumaru's conviction on this single count, however, will not affect his prison sentence because the district court sentenced Matsumaru to five concurrent forty-one month terms of imprisonment. Nevertheless, the record should reflect that Matsumaru was correctly found guilty only of two counts of wire fraud and two counts of visa fraud; he was not properly convicted

of the additional count of establishing a commercial enterprise for the purpose of evading immigration laws.

## 6. The District Court Properly Sentenced Matsumaru, Except for Ordering $50,000 in Restitution.

Finally, Matsumaru contends that the district court erred during the sentencing phase by: (a) miscalculating the loss attributable to him under United States Sentencing Guidelines (''U.S.S.G.'') § 2F1.1; (b) mischaracterizing his clients as ''vulnerable victims'' under U.S.S.G. § 3A1.1; (c) improperly ''double-counting'' sentence enhancements; and (d) neglecting to consider relevant factors when ordering $50,000 in restitution. Only this last argument has merit.

### a. Any Error in the District Court's Loss Calculation Was Harmless.

#### (1) Standard of Review

 ''We review a district court's determination of the amount of loss for clear error.'' *United States v. Scrivener*, 189 F.3d 944, 949 (9th Cir.1999). An error in the court's loss calculation is harmless if the district court ''would have imposed the same sentence absent the errors.'' *United States v. Garcia–Guizar*, 227 F.3d 1125, 1132 (9th Cir.2000) (internal quotation omitted).

#### (2) Analysis

 The district court determined that Matsumaru caused Wada and Murakami a combined loss of $711,163.83. Because Matsumaru caused a loss between $500,000 and $800,000, the district court enhanced Matsumaru's base offense level by ten points. *See* U.S.S.G. § 2F1.1(b)(1)(K) (2000).

The government showed that (1) $238,000 of a $239,000 check issued by Wada's company was deposited into Matsumaru's personal account without Wada's authorization; (2) a $370,000 check issued by Wada's company, supposedly a loan to

Matsumaru, was deposited into Matsumaru's personal account without Wada's authorization; (3) at least $23,160 in checks from Wada's company paid for Matsumaru's personal expenses, including guitar lessons, massages, fitness instruction, and alimony; and (4) Matsumaru deposited $76,374.35 back into Wada's company's account. Based on these findings, it was not clearly erroneous for the court to conclude that Matsumaru caused a loss of at least $554,785.65—well over the $500,000 cut-off for the ten point enhancement. *See id.* Any alleged errors made by the district court with respect to other calculations are therefore harmless. *See Garcia–Guizar,* 227 F.3d at 1132.

### b. The District Court Did Not Clearly Err in Characterizing Matsumaru's Clients as Vulnerable Victims.

#### (1) Standard of Review

 We "review[ ] for clear error a district court's finding that a defendant's victims were unusually vulnerable." *Scrivener,* 189 F.3d at 950.

#### (2) Analysis

 The district court determined that Matsumaru's clients—Wada, Murakami, and Tsutsumi—were "vulnerable victims," and on that basis enhanced his sentence by two points. *See* U.S.S.G. § 3A1.1(b) (2000). A vulnerable victim is a person who is "particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2 (2000).

The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

*Id.* Matsumaru points out that his clients were wealthy, sophisticated businessmen, and therefore claims that they were not vulnerable. Additionally, he argues that it was improper for the court to find that his clients' "ethnicity and cultural affiliation constitute[d] a class of susceptibility."

Matsumaru draws our attention to *United States v. Castellanos,* 81 F.3d 108, 110 (9th Cir.1996). In *Castellanos,* the defendant, as part of a fraudulent investment scheme, targeted Spanish-speakers, advertised in Spanish language media, and touted his company as "proudly Hispanic." *Castellanos,* 81 F.3d at 110. We found these factors insufficient "to support a finding of particular susceptibility under § 3A1.1 that the victims are more likely than other members of the general population to become the victim of the particular crime at issue." *Id.* We cautioned, however, that:

This is not to say that § 3A1.1 would never apply against a defendant accused of running an "affinity scam" by which a minority business owner victimizes people in his own community who are more likely to trust members of their own ethnic group. Evidence that an ethnic group was particularly susceptible to the fraud due to lack of education, extreme insularity, superstition, or lack of familiarity with United States business practices or law enforcement might suffice to support use of § 3A1.1 against a defendant accused of swindling members of such a group.

*Id.* at 112.

The facts of this case are distinguishable from those in *Castellanos.* It is true that the district judge relied on some of the same factors we found insufficient to support a finding of vulnerability in *Castellanos,* such as the fact that Matsumaru targeted Japanese nationals in Japanese publications. However, the district judge did not stop there. She also based her finding of vulnerability on different and additional factors, including the facts that Matsumaru's clients desired treaty inves-

tor visas but were unfamiliar with United States immigration laws and business practices; that Matsumaru touted himself as a bilingual attorney capable of handling immigration matters; and that the Japanese culture places absolute trust in lawyers. For instance, one of Matsumaru's clients explained why he signed documents written totally in English although he could read only Japanese: "Japanese people trust the profession of attorney entirely. So I totally trusted Mr. Matsumaru. So since he told me to sign, I sign it without any doubt...." Another client similarly clarified why he unquestioningly signed documents provided by Matsumaru: "Japanese people absolutely trust attorney. So, therefore, if there was some kind of explanation was from the attorney, we trust them entirely."

Taking all these factors together, we cannot say it was clearly erroneous for the district court to conclude that Matsumaru's clients were vulnerable victims under U.S.S.G. § 3A1.1(b). *See Castellanos,* 81 F.3d at 110; *see also United States v. Bengali,* 11 F.3d 1207, 1212 (4th Cir.1993) (finding victim to be vulnerable because he was unfamiliar with "the way we do business here and handle crime").

### c. The District Court Did Not Improperly Double–Count Enhancements.

#### (1) Standard of Review

■ We "review[ ] *de novo* the district court's interpretation and application of the Sentencing Guidelines." *Scrivener,* 189 F.3d at 950.

#### (2) Analysis

■ Matsumaru's claim that the district court improperly double-counted by applying both the "vulnerable victim" and "special skill" enhancements is specious. Double counting "occurs where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines." *United*

*States v. Reese,* 2 F.3d 870, 895 (9th Cir. 1993). Here, the vulnerable victim enhancement was based, at least in part, on factors not contemplated by the special skill enhancement, such as Matsumaru's advertisement in a Japanese publication, the victims' unfamiliarity with the English language and United States business and immigration practices, and the absolute trust the Japanese culture places in attorneys. The district court did not improperly double-count enhancements.

### d. The District Court Erred in Ordering $50,000 in Restitution.

Matsumaru argues that in ordering him to pay $50,000 in restitution, the court erred by failing to consider (1) his debilitated financial situation; and (2) the actual loss he caused Murakami.

#### (1) Standard of Review

■ As long as it does not exceed the bounds of statutory framework, we review a district court's decision to order restitution for an abuse of discretion. *United States v. Lawrence,* 189 F.3d 838, 846 (9th Cir.1999). The court's underlying factual findings are reviewed for clear error. *Id.*

#### (2) Analysis

■ The district judge did not err by refusing to account for Matsumaru's lack of financial resources. In determining whether restitution is appropriate, a court generally considers: (1) the amount of actual loss sustained by the victim; (2) the financial resources of the defendant; and (3) such other factors as the court deems appropriate. 18 U.S.C. § 3663 (West 2000). However, there is a significant exception to this general rule: if the defendant is subject to the Mandatory Victims Restitution Act ("MVRA"), the district court need not assess the defendant's ability to pay restitution. *See* 18 U.S.C. § 3664(f)(1)(A) (West 2000) ("In each order of restitution, the court shall order restitution to each victim ... without consideration of the economic circumstances

of the defendant."); *see also United States v. Dubose,* 146 F.3d 1141, 1143 (9th Cir. 1998) ("Congress enacted the MVRA in 1996 ... It makes restitution mandatory, without regard to a defendant's economic situation ....") (citations omitted). The government correctly points out that Matsumaru is subject to the MVRA because his convictions involved fraud under Title 18. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1546 (visa fraud). Therefore, the court did not err by refusing to consider Matsumaru's ability to pay restitution to Murakami.

However, we agree with Matsumaru that the court failed to properly assess the actual loss Matsumaru caused Murakami. Matsumaru misled Murakami into believing that the entire Big Golf business cost $50,000. Even though Murakami did not get the entire business, he did receive a van and a business license. The van and license obviously have some value. The district court's failure to discount the $50,000 restitution amount by their value was clearly erroneous. On remand, the district court must deduct the actual value of the van and the license from the $50,000 restitution order.

### III

### Conclusion

For the reasons expressed above, we affirm Matsumaru's convictions for the two counts of wire fraud and the two counts of visa fraud. We reverse Matsumaru's conviction for establishing a commercial enterprise for the purpose of evading immigration laws in violation of 8 U.S.C. § 1325(d). Finally, we affirm the sentence imposed by the district judge, except with respect to the restitution amount. AFFIRMED in part, REVERSED in part, and RE-MANDED.