**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Supawan VEERAPOL, Defendant–Appellant.**

**No. 00–50042.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed Dec. 9, 2002.

Cara DeVito, West Hills, California, for the appellant.

Debra W. Yang, United States Attorney; John S. Gordon, Assistant United States Attorney; Arif Alikhan, Assistant United States Attorney; Los Angeles, California, for the appellees.

Before HALL, THOMPSON and WARDLAW, Circuit Judges.

## OPINION

WARDLAW, Circuit Judge:

On August 12, 1999, Supawan Veerapol was convicted by a jury of one count of holding another to involuntary servitude in violation of 18 U.S.C. § 1584, three counts of mail fraud in violation of 18 U.S.C. § 1341, and three counts of harboring aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). Veerapol challenges for the first time the sufficiency of the evidence supporting her conviction on the count of involuntary servitude. She also appeals the district court's application of the vulnerable victim enhancement, U.S.S.G. § 3A1.1 (b)(1), to adjust her base offense level upward by two levels, contending that the vulnerability of the victim was taken into account in the offense of conviction. She further challenges the district court's order of restitution to the victim held to involuntary servitude. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the conviction, sentence, and order of restitution.

## I. Background

Veerapol, a native of Thailand and the common-law wife of a Thai ambassador, operated a Thai restaurant in Los Angeles for which she recruited Thai nationals as workers. While in Thailand in the summer of 1989, Veerapol approached Nobi Saeieo, a non-English-speaking Thai villager with a second-grade education, offering her transportation to and two years of employment in the United States at a substantially higher wage than Saeieo could earn in Thailand.

Through her contacts at the Thai embassy, Veerapol obtained a passport and a six-month visitor visa for Saeieo and bought tickets for the two of them to fly together to Los Angeles. Veerapol held Saeieo's passport throughout the journey, except as they passed through immigration. Once through immigration, however, Veerapol reclaimed Saeieo's passport.

Saeieo joined two other Thai workers at Veerapol's Los Angeles home and restaurant, where she was required to work long hours cooking, cleaning, and performing additional chores, such as washing Veerapol's car, giving Veerapol manicures and pedicures, and cleaning her nine-year-old son after he went to the bathroom. Saeieo was required to wait upon Veerapol's houseguests on one knee. Veerapol also used her Thai workers' identities to open bank and credit card accounts, which she then used for her own benefit.

Veerapol isolated her workers by imposing excessive working hours and by prohibiting them from reading newspapers in

their native language, going to stores, speaking with her houseguests and the customers at the restaurant, or using the telephone or mail. She maintained control over them through verbal abuse and threats of legal action and physical force. Veerapol refused Saeieo's frequent entreaties to allow her to return to Thailand, at one point telling her that if she left, Veerapol would kill her. One night at her restaurant, Veerapol was particularly abusive to Saeieo and pinched her arm, causing a large fist-sized bruise. Veerapol also told her that the police in the United States would arrest her as an illegal alien were she to seek their help. In 1995, after Saeieo's sister contacted the Thai Foreign Ministry in Thailand to inquire about Saeieo, a Thai consular official requested a meeting with Veerapol and Saeieo, and Saeieo was eventually allowed to return to Thailand. The two other Thai workers later escaped to a local shelter.

On May 1, 1998, a grand jury indicted Veerapol on charges of harboring aliens. Later superseding indictments added counts of involuntary servitude and mail fraud. A jury convicted Veerapol of one count of involuntary servitude with respect to Saeieo and of the charges of mail fraud and harboring aliens. On January 10, 2000, the district court sentenced Veerapol to a 97–month term of imprisonment, a three-year term of supervised release, and a $1,100 special assessment. Her sentence was based, in part, on the district court's application of a two-point "vulnerable victim" sentencing adjustment under U.S.S.G. § 3A1.1(b)(1). On March 10, 2000, she was ordered to pay $71,133.56 in restitution to Saeieo.

## II. Standards of review

 Veerapol has forfeited her challenge to the sufficiency of the evidence on appeal because she failed to raise this claim at any point before the district court. While one may query as to whether Veerapol's failure to make the requisite Rule 29 judgment of acquittal motion precludes review because the error, if any, is that of defense counsel and not of the district court, the Supreme Court has rejected an analogous argument under Rule 52(b). *See United States v. Olano,* 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("Although in theory it could be argued that '[i]f the question was not presented to the trial court no error was committed by the trial court, hence there is nothing to review,' ... this is not the theory that Rule 52(b) adopts."). Moreover, we have held that where "a defendant fails to challenge the sufficiency of the evidence before the district court, review is for plain error." *United States v. Romero,* 282 F.3d 683, 686–87 (9th Cir. 2002) (citing *United States v. Yossunthorn,* 167 F.3d 1267, 1270 n. 4 (9th Cir.1999)). "Forfeited rights are reviewable for plain error...." *United States v. Perez,* 116 F.3d 840, 845 (9th Cir.1997) (en banc); *see also* Fed.R.Crim.P. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

 We review de novo Veerapol's challenge to the district court's interpretation and application of the Sentencing Guidelines. *See United States v. Matsumaru,* 244 F.3d 1092, 1108 (9th Cir.2001) (quoting *United States v. Scrivener,* 189 F.3d 944, 950 (9th Cir.1999)). We review "for clear error a district court's finding that a defendant's victims were unusually vulnerable." *Id.* at 1107 (quoting *Scrivener,* 189 F.3d at 950). We review a district court's restitution order for abuse of discretion, provided that the order "does not exceed the bounds of [the] statutory framework." *Id.* at 1108. "The court's underlying factual findings are reviewed

for clear error." *Id.* (citing *United States v. Lawrence,* 189 F.3d 838, 846 (9th Cir. 1999)).

## III. Discussion

### A. Involuntary servitude

▮ A person commits the offense of holding another to involuntary servitude under 18 U.S.C. § 1584 when she "knowingly and willfully holds to involuntary servitude . . . any other person for any term." 18 U.S.C. § 1584. The Supreme Court has clarified that a conviction under § 1584 requires evidence that "the victim [was] forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use of coercion through law or the legal process." *United States v. Kozminski,* 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). Once this requirement is met, the jury next determines "whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve," and may consider such factors as "evidence of other means of coercion, or of poor working conditions, or of the victim's special vulnerabilities." *Id.* at 952, 108 S.Ct. 2751.

▮ We decline Veerapol's invitation to construct a minimum level of threats or coercion required to support a conviction beyond *Kozminski's* plausible compulsion requirement. Instead, we leave this evaluation squarely in the hands of the jury. Indeed, the Supreme Court specifically noted in *Kozminski* that "threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude." *Id.* at 948, 108 S.Ct. 2751. In light of the evidence presented at trial of Veerapol's threats of physical and legal harm to and her physical abuse of Saeieo, and the dis-

trict court's proper instruction of the jury under *Kozminski,* we find no error, and hence no plain error. We therefore deny Veerapol's sufficiency challenge. *See Matsumaru,* 244 F.3d at 1102.

### B. Vulnerable victim enhancement

Veerapol next argues that the district court erred at sentencing by adjusting her base offense level upward by two points under U.S.S.G. § 3A1.1(b)—the "vulnerable victim" enhancement. Veerapol contends that application of § 3A1.1(b) improperly double-counted Saeieo's vulnerability both in convicting and in sentencing her because to convict Veerapol the jury must already have considered Saeieo's vulnerability to determine that she reasonably believed that she could not avoid continued service.

Section 3A1.1(b)(1) provides for a two-level adjustment when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). Application Note 2 defines "vulnerable victim" as one who is "unusually vulnerable due to age, physical or mental condition, or *who is otherwise particularly susceptible to the criminal conduct.*" *Id.* (emphasis added). Application Note 2 cautions, however, that the adjustment is not appropriately applied when

> the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

*Id.*

▮ The Specific Offense Characteristics for a § 1584 conviction do not provide an adjustment for victim characteristics

such as Saeieo's immigrant status and the linguistic, educational, and cultural barriers that contributed to her remaining in involuntary servitude. *See* U.S.S.G. § 2H4.1(b) (providing adjustments for (1) permanent, life-threatening, or serious bodily injury to the victim; (2) use, brandishment, or threat of use of a dangerous weapon; (3) certain terms of involuntary servitude; and (4) commission of a related felony). Indeed, at sentencing, the district court cited none of the Specific Offense Characteristics named in § 2H4.1 to justify its application of the vulnerable victim adjustment:

> The victim here was, I think, vulnerable based on her immigrant status and the circumstances in which the immigrant status was exploited by your client from the initial recruitment, and the treatment of the individuals while they were here—or the way Miss Nobi Saeieo was treated. She was relatively isolated from her community, and I think the defendant exploited that.
>
> The victim was basically a poor uneducated woman, lacking in sophistication, in the knowledge of the United States laws, and I think that was also exploited, and that was supported by the expert testimony, as well.

We have forbidden the general application of § 3A1.1 in rare circumstances where, unlike involuntary servitude cases, the victim's vulnerability is typically incorporated into the offense. *See United States v. Williams*, 291 F.3d 1180, 1195–96 (9th Cir.2002); *United States v. Castaneda*, 239 F.3d 978, 981 (9th Cir.2001). In *Williams* and *Castaneda*, we determined that the victims under the Mann Act were typically economically deprived, and thus application of the adjustment would be inappropriate except under special circumstances. *See Williams*, 291 F.3d at 1196 (upholding adjustment for one Mann Act

victim for whom the district court made specific findings of particular vulnerability). Our limitation on the § 3A1.1 enhancement in Mann Act cases does not apply in cases where the specific manner in which the defendant committed the offense is a "scheme ... [that] typically targets people like the victims [in that case.]" *United States v. Mendoza*, 262 F.3d 957 (9th Cir.2001). Thus, Veerapol's argument that the district court erred in applying the vulnerable victim enhancement is not advanced by her assertion that Saeieo was not *unusually* vulnerable any more than any other poor, unsophisticated, non-English-speaking, illegal alien whose reasonable feelings of coercion the jury must take into account to convict.

The appropriateness of the adjustment in Veerapol's case is also apparent from our recent explanation that a sentencing judge must make two determinations in applying the vulnerable victim enhancement:

> First, the judge must determine whether one or more of the victims belong to a class that is particularly vulnerable to the criminal activity in question, and second, is there one or more specific individual victims whom the defendant knew or should have known were unusually vulnerable by virtue of membership in the class identified.

*United States v. Luca*, 183 F.3d 1018, 1025 (9th Cir.1999). Consistent with *Mendoza*, this process's first prong focuses on the vulnerability to the criminal activity generally—i.e., involuntary servitude of any type. The *Luca* analysis is also consistent with Application Note 2's direction that the adjustment does not apply when "the factor that makes the person a vulnerable victim is incorporated in the offense guideline." U.S.S.G. § 3A1.1. In contrast, for involuntary servitude offenses involving victims who would not reasonably believe

they were being coerced by conduct such as that of Veerapol, and who would thus require greater physical coercion, § 2H4.1(b) already incorporates factors that would increase the offense level, for example, for serious physical injury or use of a dangerous weapon. Because Saeieo's special characteristics as a vulnerable alien are not similarly incorporated into the Specific Offense Characteristics, the district court did not err in applying the adjustment.

## C. Restitution

■ Veerapol objects to the district court's order of restitution to Saeieo in the amount of $71,333.56 for back wages on the ground that it violated due process because it was entered after sentencing and Veerapol did not have the opportunity to cross-examine Saeieo about her financial incentive to testify at trial. We disagree and find the restitution order both timely and proper.

■ The district court's restitution order did not improperly "exceed the bounds of [the] statutory framework." *Matsumaru*, 244 F.3d at 1107. Indeed, the Mandatory Victims Restitution Act *requires* the court to "order, in addition to . . . any other penalty authorized by law, . . . the defendant [to] make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). This provision applies to victims of "crimes of violence," as defined in 18 U.S.C. § 16. 18 U.S.C. § 3663A(c). In turn, § 16 defines a crime of violence to include "an offense that has as an element the use, attempted use, or threatened use of physical force against the person . . . of another" and "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16. The evidence at trial of the use and threatened use of force

against Saeieo supports the characterization of Veerapol's involuntary servitude conviction as a crime of violence. In addition, the order was entered within the ninety-day statutory time period prescribed by 18 U.S.C. § 3664: Veerapol was sentenced on January 10, 2000 and the restitution order was entered on March 10, 2000, sixty days later. Thus, Veerapol's use and threats of force *required* the district court to order restitution, and the order was within the statutory framework and timely entered.

Veerapol's constitutional challenge to her restitution order is without merit. The MVRA was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA"), nearly two years prior to Veerapol's indictment, and is published in the United States Code. AEDPA § 211 made the MVRA "effective for sentencing proceedings in cases in which the defendant is convicted on or after the date of enactment of this Act," i.e., April 24, 1996. *See* 18 U.S.C. § 2248 note (Effective and Applicability Provisions). In light of the mandatory nature of the restitution order, Veerapol cannot claim that her constitutional rights were violated because she lacked notice prior to trial of the possibility of restitution and was thus deprived of an opportunity to impugn Saeieo's motive for testifying. Indeed, courts have ordered restitution in an amount equivalent to back wages for victims of involuntary servitude even in cases predating the MVRA. *See, e.g., United States v. Alzanki*, 54 F.3d 994, 1009 (1st Cir.1995).

## IV. Conclusion

For the reasons stated above, Veerapol's conviction for involuntary servitude, the district court's application of the vulnera-

ble victim sentencing enhancement, and its order of restitution are hereby

**AFFIRMED.**