UNITED STATES of America, Plaintiff–Appellant,

v.

Giovanni RAMIREZ, Defendant–Appellee.

No. 02–50018.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 2003.

Filed Oct. 24, 2003.

---

Judith A. Heinz, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellant.

C.R. McReynolds (argued), Charles T. Matthews, Pasadena, CA, for defendant-appellee.

Before FERGUSON, HALL, and BERZON, Circuit Judges.

Opinion by Judge FERGUSON; Partial Concurrence and Partial Dissent by Judge CYNTHIA HOLCOMB HALL.

## OPINION

FERGUSON, Senior Circuit Judge.

This appeal presents the issue of whether a temporary detention ordered by the California Youth Authority Youth Offender Parole Board may be treated as either a prior sentence or a constructive parole revocation for the purpose of calculating criminal history points under the Sentencing Guidelines ("Guidelines"). Appellee Giovanni Ramirez pleaded guilty to a Class A felony with a statutory minimum sentence of 10 years. The District Court found that Ramirez's two prior temporary detentions, which were ordered by the Youth Offender Parole Board as a result of

alleged parole violations, were neither prior sentences under U.S. Sentencing Guidelines Manual § 4A1.1(c) (2002) [hereinafter U.S.S.G.], nor terms of imprisonment imposed as a result of a revocation of parole that could be aggregated with Ramirez's juvenile sentence under U.S.S.G. § 4A1.2(k) (2002). As a result, the District Court determined that Ramirez had no criminal history points and was eligible for a "safety-valve" departure from the mandatory minimum under U.S.S.G. § 5C1.2 (2002).

We have jurisdiction pursuant to 18 U.S.C. § 3742(b) (2002) and 28 U.S.C. § 1291 (2002). Because we conclude that the temporary detentions neither resulted from "adjudications of guilt" beyond a reasonable doubt nor constituted returns to the original term of imprisonment such that they could be treated as constructive revocations of parole, we affirm.

## I. BACKGROUND

On December 19, 2000, Ramirez pleaded guilty to distribution of 62.5 grams of methamphetamine, a Class A felony carrying a statutory minimum sentence of 10 years. 21 U.S.C. § 841(b) (2002). Based on Ramirez's record with the California Youth Authority (CYA), discussed below, the Probation Department's Presentence Report (PSR) concluded that Ramirez had two criminal history points and was therefore ineligible for a safety-valve departure from the mandatory minimum.

### A. Ramirez's History with CYA

On September 27, 1989, at the age of seventeen and over ten years before the instant offense, Ramirez was found guilty of rape and four other counts and placed in the custody of CYA. Ramirez served a little less than four years of his fourteen year sentence and was paroled from CYA on July 29, 1993, over five years prior to the commission of the instant offense.

On June 21, 1996, Ramirez was issued a citation for speeding. Three days after the citation, he tested positive for marijuana use. As a result of these two occurrences, his parole officer prepared a Corrective Action Plan (CAP)[1] which recommended that Ramirez receive 30 days of "temporary detention" at Los Angeles County Jail.[2] On July 24, Ramirez signed the CAP and checked a box indicating that he admitted to the speeding and marijuana allegations, waived all rights to a fact-finding hearing, and accepted the recommended CAP. On August 2, 1996, the Youth Offender Parole Board (YOPB) concurred with the CAP and ordered the temporary detention. The YOPB order did not indicate that there had been either a probable cause or a violation determination. Ramirez was detained from July 24 through August 19, 1996.

On November 18, 1996, Ramirez was arrested for possession of a concealed weapon. He was subsequently detained pending a determination of whether the arrest constituted a violation of his parole. On November 20, 1996, Ramirez waived his right to a probable cause hearing, and on November 27, 1996, YOPB issued an order making a probable cause finding as

---

**1.** According to Parole Agent John Sauceda, "CYA ... implemented the use of a CAP to address lower end parole violations where the parolee had signed a waiver of a fact finding hearing."

**2.** The temporary detention regulation authorizes "detention of a[CYA] parolee for 30 days or less for treatment purposes and/or to redefine the conditions of parole." Cal. Code Regs. tit. 15, § 4985 (2003). The regulation explains that "[t]emporary detention shall be used when the violation process is not contemplated." Id.

to the alleged violation. On January 8, 1997, Ramirez's parole officer issued a disposition report recommending that Ramirez be continued on parole and placed in a drug treatment program.

On April 11, 1997, the YOPB issued an order requiring that Ramirez continue to be detained pending a hearing on his alleged violation. The order stated that Ramirez "had several violations in 1996 and his commitment offense, recent parole performance, and this arrest necessitate a viol[ation]/ disposition hearing." On May 1, 1997, Ramirez signed a form acknowledging that he had received notice of his rights regarding the parole hearing and waiving his right to a fact-finding hearing, witnesses, or the assistance of an attorney. He admitted the weapons possession allegation as described in the probation disposition report.

On May 13, 1997, based on Ramirez's admission, the YOPB found that there had been a parole violation. However, instead of revoking his parole, the YOPB ordered Ramirez to spend two weeks in temporary detention. The order specifically noted under "Reasons" for its disposition that Ramirez would "be better served by parole supervision." Ramirez was released from temporary detention on May 27, 1997. It is undisputed by the parties that Ramirez's parole was never actually revoked under state law. On September 11, 1997, Ramirez was discharged from CYA parole.

### B. Sentencing for the Instant Offense

The District Court conducted a total of eight sentencing hearings. In addition to their initial sentencing briefs, the parties submitted three sets of supplemental briefs, and the probation office submitted two addenda to the PSR. In addition, the District Court requested and heard testimony from both of Ramirez's CYA parole officers and from the YOPB member who had signed the two temporary detention orders.

On December 7, 2001, the District Court issued its sentencing decision.[3] Specifically, the District Court found that (1) Ramirez's parole was not "revo[ked]" as that term is used in U.S.S.G. § 4A1.2(k); (2) Ramirez's temporary detentions were not the result of an "adjudication of guilt" and therefore could not be treated as prior sentences under U.S.S.G. § 4A1.2(d)(2)(B); and (3) in light of the above findings, Ramirez was eligible for a safety-valve departure under U.S.S.G. § 5C1.2. On January 2, 2002, the government filed its notice of appeal.

## II. STANDARD OF REVIEW

■ A district court's interpretation of the Sentencing Guidelines is reviewed *de novo. See United States v. Veerapol,* 312 F.3d 1128, 1131 (9th Cir.2002). Factual findings underlying a district court's sentencing determination are reviewed for clear error. *See id.* at 1131–32. "The government bears the burden of proving the fact of a prior conviction." *United States v. Sanders,* 41 F.3d 480, 486 (9th Cir.1994). Whether "a prior adjudication falls within the scope of the Sentencing Guidelines" is a question of law that is reviewed *de novo. Id.* at 486; *see also United States v. Latimer,* 991 F.2d 1509, 1511 (9th Cir.1993).

## III. DISCUSSION

The government contends that the District Court erred in finding that Ramirez

---

3. On May 9, 2002, the District Court issued an order outlining the reasoning and legal authority underlying its sentencing decision.

was eligible for a safety-valve departure because Ramirez should have had at least two points added to his criminal history score as a result of his two YOPB imposed temporary detentions, either because the detentions are "prior sentences" under U.S.S.G. § 4A1.1 or because the detentions constituted constructive parole revocations that, under U.S.S.G. § 4A1.2(k), could be aggregated with Ramirez' juvenile sentence of imprisonment.[4]

## A. Temporary Detention as a Prior Sentence under U.S.S.G. § 4A1.1(c)

Under U.S.S.G. § 4A1.1(c), a defendant receives one criminal history point for "each prior sentence[that is neither a prior sentence of imprisonment exceeding one year and one month] or [a prior sentence of imprisonment of at least sixty days], up to a total of 4 points." U.S.S.G. § 4A1.1(c). The definition of a "prior sentence" is "any sentence previously imposed upon an adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere,* for conduct not part of the instant offense." § 4A1.2(a)(1).

■ The District Court determined, and Ramirez urges on appeal, that the proceedings underlying the temporary detentions were not "adjudications of guilt." "When interpreting the sentencing guidelines, we have carefully distinguished between confinement resulting from an adju-

dication of guilt and confinement for other reasons." *United States v. Johnson,* 205 F.3d 1197, 1200 (9th Cir.2000). "Absent proof that the [prior] court found [the defendant] guilty beyond a reasonable doubt, [an] adjudication may not be used to increase [the] criminal history score." *Sanders,* 41 F.3d at 486.

■ In the instant case, the government has failed to show that either of the detentions resulted from a finding of guilt beyond a reasonable doubt. The regulation authorizing the YOPB to order a temporary detention requires only a preponderance showing. CAL. CODE REGS. tit. 15 § 4985(c)(6).[5] Because neither of the detentions were imposed as a result of, nor even required, a finding of guilt beyond a reasonable doubt, we agree with the District Court that neither can be viewed as "prior sentences" for the purpose of increasing Ramirez's criminal history score.

■ The government asserts that because Ramirez admitted to the allegations in both cases, there is no need to show that there was a finding of guilt. However, the Guidelines specifically require that an "adjudication of guilt" result from a "guilty plea, trial, or plea of *nolo contendere.*" U.S.S.G. § 4A1.2(a). No mention is made of "confessions" or "admissions." "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction." *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 23

---

4. Because a defendant can qualify for the safety-valve provision of the Guidelines so long as he does "not have more than 1 criminal history point," *see* U.S.S.G. § 5C1.2(a)(1), the United States must show *either* that *both* of the temporary detentions qualify as prior sentences *or* that one of the detentions can be treated as a constructive revocation that can be aggregated with Ramirez's four-year term of imprisonment. Unless aggregated with his time in temporary detention, Ramirez's prior term of imprisonment may not be considered because he was released over five years be-

fore the commission of the instant offense. *See* U.S.S.G. § 4A1.2(d)(2).

5. This is also the standard used generally. *See United States v. Guadarrama,* 742 F.2d 487, 489 (9th Cir.1984) ("The standard of proof required is that the evidence and facts be such as [to] reasonably ... satisfy the judge that the probationer's conduct has not been as required by the conditions of probation.").

L.Ed.2d 274 (1969). As such, a valid plea requires that "an accused facing ... imprisonment [receive] the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Id.* at 243–44, 89 S.Ct. 1709; *cf.* FED. R. CRIM. P. 11(b) (setting out requirements for a valid plea allocution). The government has presented no evidence that Ramirez's admissions were the functional equivalent of a valid plea. *Cf. United States v. DiPina,* 230 F.3d 477, 484–85 (1st Cir.2000) (describing factors required for finding of constructive plea). The fact that Ramirez admitted to the allegations, without more, is not sufficient to transform the proceedings into a prior adjudication of guilt under § 4A1.2(a).

### B. Temporary Detention as a Constructive Revocation of Parole

The government alternatively asserts that the District Court erred because the temporary detentions should have been treated as constructive revocations of parole and aggregated with Ramirez's prior sentence. Specifically, the government argues that the term "revocation," as used in U.S.S.G. § 4A1.2(k), should be interpreted to include any instance in which confinement is imposed due to a parole violation, even where parole is not formally revoked under state law.

The Guidelines require that revocations of parole be considered in calculating a sentence so that "the original term of imprisonment [is added] to any term of imprisonment imposed upon revocation." U.S.S.G. § 4A1.2(k)(1). "To qualify as a sentence of imprisonment, the defendant must have actually served a period of imprisonment on such sentence." U.S.S.G. § 4A1.2 cmt. n. 2. In addition,

[r]evocation of ... parole ... may affect the time period under which certain sentences are counted as provided in § 4A1.2(d)(2) and (e). For the purposes of determining the applicable time period, use the following: ... (ii) in the case of any other confinement sentence for an offense committed prior to the defendant's eighteenth birthday, the date of the defendant's last release from confinement on such sentence (*see* § 4A1.2(d)(2)(A)).

U.S.S.G. § 4A1.2(k)(2)(B).

■ In determining the meaning of "revocation" under the Guidelines, we must apply a uniform, federal definition, "not dependent upon the vagaries of state law." *See United States v. Martinez,* 232 F.3d 728, 732 (9th Cir.2000) (citing *Taylor v. United States,* 495 U.S. 575, 591–92, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). Thus, to the extent the District Court relied exclusively on state law definitions of "revocation," it erred. However, because we determine that under a federal definition of revocation, Ramirez's parole was not revoked in either instance, such error by the District Court was harmless.

### 1. Definition of Revocation Under § 4A1.2(k)

■ The purpose of creating a uniform federal definition of terms within the Guidelines is to effectuate consistent nationwide application of federal legislation. *See Taylor,* 495 U.S. at 591, 110 S.Ct. 2143 (quoting *Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 119–20, 103 S.Ct. 986, 74 L.Ed.2d 845 (1983)). In determining what the federal definition of a particular term is, courts look to the plain language and legislative history of the statute, as well as the use of the term in practice. *See Taylor,* 495 U.S. at 594–98, 110 S.Ct. 2143. As with all penal statutes, the rule of lenity requires that we construe ambig-

uous terms in favor of the accused. *Id.* at 596, 110 S.Ct. 2143. "This maxim of statutory construction, however, cannot dictate an implausible interpretation of a statute, nor one at odds with the generally accepted contemporary meaning of a term." *Id.* (citing *Perrin v. United States,* 444 U.S. 37, 49 n. 13, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

In contrast to criminal offenses, the elements of which frequently vary from state to state, the definition of "revocation" is consistent from state to state. Like the terms "conviction" or "plea," the term "revocation" describes a specific outcome of a process, the basic requirements of which have been clearly articulated by the Supreme Court. We look to these constitutional requirements to determine the outer boundaries for the federal definition of revocation before proceeding to consider the statutory text and contemporary understanding of the term.

### a. Constitutional Requirements for Probation or Parole Revocation

▮ Before a revocation of parole or probation can occur, the Constitution requires that there be (1) a formal finding that a probationer or parolee has committed a violation and (2) a determination that the violation was serious enough to warrant reimposing the probationer's or parolee's original sentence. *See Morrissey v. Brewer,* 408 U.S. 471, 479–80, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (setting out requirements for parole revocation); *see also Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (extending requirements of *Morrissey* to probation revocation hearings). Because the consequences of the revocation process are serious, *see Morrissey,* 408 U.S. at 482, 92 S.Ct. 2593, the probationer or parolee must be afforded an opportunity to pres-

ent evidence to suggest that his violation does not warrant revocation. *See id.* at 487–88, 92 S.Ct. 2593. In addition to a preliminary hearing to determine whether there was reasonable cause to believe that a probationer or parolee had violated the conditions of his probation or parole, a final revocation hearing must be held by the probation or parole authority, if so desired by the probationer or parolee, in order to determine whether revocation is actually warranted. *See id.* at 486–88, 92 S.Ct. 2593.

▮ A violation alone does not automatically trigger a revocation. *See id.* at 479, 92 S.Ct. 2593. Probation or parole authorities generally have two options: modify or extend the conditions of supervision, or revoke. *See, e.g.,* U.S.S.G. § 7B1.3(a)(2) (2002). Where other steps are available which will protect society and improve chances of rehabilitation, revocation is generally inappropriate. *See Morrissey,* 408 U.S at 480, 92 S.Ct. 2593, *see also id.* at 484, 92 S.Ct. 2593 ("Society ... has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions."). The probation or parole authority, having both expertise and the entire record of the probationer or parolee before it, is presumptively the party in the best position to choose whether to revoke or impose some form of intermediate sanction. *See id.* at 480, 92 S.Ct. 2593 ("deciding what to do about the violation once it is identified ... is not purely factual but also predictive and discretionary").

▮ In sum, before a district court can conclude that there has been a revocation pursuant to § 4A1.2(k), there must be, at minimum, a showing that the requirements of *Morrissey* were met. *See Johnson,* 205 F.3d at 1199–1200 (finding record insufficient to uphold finding of revocation

where probationer was detained three times and no revocation hearing was ever held). Where a parole or probation authority has effectuated an actual revocation, the government can rely on the record from that proceeding to show that § 4A1.2(k) is applicable. *See United States v. Newman,* 912 F.2d 1119, 1122 (9th Cir.1990) (where government has presented record of prior conviction, defendant may rebut government's assertion that prior conviction occurred by showing constitutional invalidity of proceeding). However, where no such record is present, we must presume that no revocation occurred.

#### b. Ordinary Meaning & Legislative History

 Keeping in mind the requirements of *Morrissey,* and following the two general principles that (1) "[c]ourts can and should ... adopt statutory interpretations, when feasible, that will avoid serious constitutional issues," *United States v. Hernandez,* 322 F.3d 592, 602 (9th Cir. 2003) (as amended), and (2) "penal statutes must be strictly construed," *Gasho v. United States,* 39 F.3d 1420, 1432 n. 11 (9th Cir.1994) (citing *United States v. Wiltberger,* 5 Wheat. 76, 18 U.S. 76, 95, 5 L.Ed. 37 (1820)), we now turn to the language in the Guidelines discussing revocation.

 The particular provision at issue here requires that "the original term of imprisonment [be added] to any term of imprisonment imposed upon revocation." U.S.S.G. § 4A1.2(k)(1). Neither the Guidelines nor Commentary to the provi-

sion provides a definition of revocation. However, the "conventional understanding of 'revoke' [is] 'to annul by recalling or taking back.'" *Johnson v. United States,* 529 U.S. 694, 704, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 1944 (1981)). Under this definition, revocation occurs when the privilege of remaining under parole or probation supervision, as opposed to imprisonment, is annulled or cancelled. Modifications of the terms of parole or probation, under which the parolee or probationer remains under the supervision of probation, are not covered, as parole or probation supervision continues and is therefore not "annulled."[6]

 This construction is consistent with the Guidelines' own probation scheme, which gives sentencing courts discretion to "revoke ... *or* [ ] extend the term of probation or supervised release and/or modify the conditions of supervision." U.S.S.G. § 7B1.3(a)(2) (emphasis added). By articulating a clear distinction between formal revocation proceedings and modifications imposed as a result of lower-level violations, the Guidelines contemplate the serious nature of revocation and distinguish it from lesser sanctions imposed without the full protections *Morrissey* requires. Where the terms of probation are modified, including imposition of temporary periods of confinement, but the probationer remains under the supervision of the probation entity, revocation has not occurred. *But see United States v. Glover,* 154 F.3d 1291, 1293–94 (11th Cir.1998)

---

**6.** Although *Johnson* went on to rely upon a looser, unconventional definition of the term "revoke," *see* 529 U.S. at 704–07, 120 S.Ct. 1795, it did so because the text of the particular statute at issue in that case, combined with congressional purpose and prior practice, suggested that the conventional definition could not apply. *See id.* *Johnson* made

clear that its departure from the ordinary meaning of "revoke" was only justified because the "text implie[d] that a word [wa]s used in a secondary sense and clear legislative purpose [wa]s at stake." *Id.* at 707 n. 9, 120 S.Ct. 1795. In the instant case, consideration of the same factors identified in *Johnson* supports the conventional definition.

(discussed *infra*) (rejecting defendant's argument that modifications cannot be treated as revocations under the Guidelines).[7] Thus, the term "revocation," as used in § 4A1.2(k)(1), requires that before probation or parole supervision can continue after a revocation, the sentencing authority must sentence the defendant anew.

■ The rule of lenity favors such a narrow construction. We "will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Latimer,* 991 F.2d at 1514 (quoting *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980)) (citation omitted). In this case, the government has presented no evidence that Congress intended any violation accompanied by a confinement sanction to be treated as a revocation for the purposes of § 4A1.2(k). As discussed above, we believe that the plain language suggests the contrary. Given that neither the text nor the commentary contemplate such an interpretation, and given the constitutional concerns raised by subsequently recategorizing informal modification procedures as implicitly compliant with the requirements of *Morrissey,* we must construe the statute narrowly.

Finally, we note that this construction of § 4A1.2(k) does not preclude the use of evidence of parole or probation conduct that the government believes is relevant to sentencing, nor does it undermine the general premise that "repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation." U.S.S.G. ch. 4, pt. A., introductory cmt. (2001); *contra*

*Glover,* 154 F.3d at 1294 (quoting *Glidden,* 77 F.3d at 40) (indicating that failing to treat probation violations as revocations under § 4A1.2(k) would be contrary to the purpose of the Guidelines). The government is still free to present to the court "reliable information ... [that] indicates that the criminal history category does not adequately reflect ... the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3.

■ The government nevertheless argues that any term of confinement presumptively reflects an intent to annul the privilege of parole or probation, regardless of whether the parole or probation entity expresses such an intent in a formal determination. Essentially, the government is arguing that a narrow construction is "at odds with the generally accepted contemporary meaning" of revocation. *Taylor,* 495 U.S. at 596, 110 S.Ct. 2143 (citing *Perrin,* 444 U.S. at 49 n. 13, 100 S.Ct. 311). We agree that any uniform federal definition should comport with state and federal probation practice. Interpretation of the Guidelines "can be informed by how the states interpret and apply their own criminal laws." *United States v. Wood,* 52 F.3d 272, 276 n. 4 (9th Cir.1995). We therefore turn to practice in order to address whether the government's suggested presumption is warranted.

### c. State and Federal Practice

It is clear that, in practice, the imposition of a term of confinement during the ordinary course of parole or probation does not necessarily mean that a revocation has occurred. State statutes describe a wide array of intermediate sanctions

---

**7.** The recognition that short periods of confinement are not always relevant to a criminal history score is implicit in U.S.S.G. § 4A1.2(c), which distinguishes between sentences for low level offenses that are of short duration (less than 30 days) and therefore not generally counted, and those which are "of at least thirty days" and therefore are. *See* U.S.S.G. § 4A1.2(c)(1).

which are clearly intended as alternatives to revocation; some, like the statute in this case, are uniquely targeted at juvenile parolees or probationers.[8] The most commonly available sanctions are modifications such as increased supervision, lengthened terms of parole, or enrollment in so-called "boot camp" or "scared straight" programs. *See supra* note 8. Temporary detention statutes like the one utilized in the instant case are also common. *See id.*

From this vast array of options, parole or probation officials choose the punish-

ment that they believe will best address the needs of the individual parolee or probationer. A finding of a "technical" or lower-level violation typically results in the imposition of an intermediary sanction and not in actual revocation. *See generally* U.S. Probation Office, CENT. DIST. OF CAL. REVOCATION WORKBOOK (last revised 2003). Because their primary aim is to act as a warning to the parolee or probationer, modification procedures generally lack the formality or due process protections required by actual revocation; they are not

---

**8.** At least 19 states have statutes providing for intermediary sanctions involving confinement. Many of these sanctions are explicitly designed to allow for punishment of lower-level violations without actual revocation proceedings. *See* ARIZ. REV. STAT. ANN. § 13–914(a)(2) (West 2003) (authorizing commitment of violators to an intensive probation program); COLO. REV. STAT. ANN. § 18–1.3–301(c) (West 2003) (providing that probation officers may recommend violators be committed to a community corrections program); DEL. CODE ANN. tit. 11, §§ 6705(d) and 6711 (2002) (authorizing violators' enrollment in intensive boot camp incarceration and aftercare parole supervision program); FLA. STAT. ANN. § 958.045(3) (West 2003) (establishing short "shock incarceration" in Youthful offender basic training program as option for offenders); GA. CODE ANN. § 42–8–35.4(a) (West 2002) (permitting trial judge to require a defendant who has violated probation to complete a program of confinement in a detention center); HAW. REV. STAT. ANN. § 353–63.5(b)–(c) (Michie 2002) (authorizing paroling authority to impose several alternative programs in lieu of incarceration, including home detention, intense supervision, and therapeutic residential and nonresidential programs); 730 ILL. COMP. STAT. 5/3–2–2(q) (West 2003) (establishing a diversion program to provide a structured environment for parole violators who commit "technical" violations); IOWA CODE ANN. §§ 908.11(4), 904.207 (West 2003) (permitting court to either sentence probationer to jail term while continuing probation status or order the defendant to be placed in a violator facility established for the temporary confinement of certain offenders); LA. REV. STAT. ANN. § 15:574.7(B)(2)(b) (West 2003) (permitting parolee violator to be

committed to a community rehabilitation center or a substance abuse treatment program as alternative to revocation); MICH. COMP. LAWS ANN. § 769.31(b) (West 2003) (providing list of "intermediate sanction"); MO. ANN. STAT. § 217.378 (West 2002) (establishing probationer violator's eligibility for a program of institutional correctional alternatives to jail in discipline, exercise, and treatment); NEV. REV. STAT. ANN. § 176A.660(1) (Michie 2003) (allowing probationer to be placed in residential confinement for parole violations); N.C. Gen. Stat. § 15A–1344(e) (2003) (authorizing periods of temporary imprisonment for probationers in violation); OHIO REV. CODE ANN. § 2967.141 (West 2003) (establishing series of violation sanction centers as restrictive control sanctions); OKLA. STAT. ANN. tit. 57, §§ 516(A)–17(A) (West 2003) (stating that if revocation is deemed unnecessary for the nature of the violation, parolee or probationer may be placed in an intermediate sanctions facility); OR. REV. STAT. § 144.106(1)-(2) (2001) (authorizing a "continuum of administrative sanctions," including jail, community service, house arrest, electronic surveillance, restitution, and work release, for violations of post-prison supervision); VA. CODE ANN. § 19.2–316.2(A)(3) (Michie 2003) (allowing violators to be temporarily committed to detention center); WIS STAT. ANN. § 301.048(1)-(4) (West 2002) (establishing an intensive sanctions program consisting of a series of phases based on "public safety considerations and the need for punishment and treatment"); WYO. STAT. ANN. § 7–13–1107 (Michie 2003) (listing several administrative sanctions available as alternatives to probation or parole revocation, including series of "restrictions on personal liberty").

intended to rise to the level of a formal revocation.[9]

It is clear that a violation can result in a vast range of sanctions, including revocation, none of which are necessarily directly related to either the seriousness of the violation or the culpability of the parolee or probationer. *Cf.* U.S.S.G. § 7B1.3(a) (distinguishing between mandatory versus discretionary revocation on the basis of the seriousness of the violation). The inherently flexible and discretionary nature of the different state systems, which aim to consider the totality of the parolee's or probationer's history as well as the gravity of the violation, leads to discrepancies in the type of sanctions handed down for even the same minor violations. A definition of revocation that looks only to the nature of the sanction imposed would thus result in a rule that is more arbitrary than what would result if we adhered to an actual revocation requirement. Parolees or probationers who engaged in similar offenses would receive vastly different sentences based on unsubstantiated guesses as to what parole or probation boards intended to do. We do not believe that Congress contemplated such a result when it wrote § 4A1.2(k).

In short, both *Morrissey* and practice instruct that we should defer to the original parole or probation entity to determine whether or not revocation is an appropriate sanction for the violation. By engaging in ad-hoc determinations that violations are of a sufficiently serious nature to warrant revocation, or by interpreting a particular sanction as indicative of an intent to revoke, subsequent courts usurp the discretion of the parole or probation authority. Where the parole or probation authority followed the procedures required for revocation but explicitly chose not to initiate revocation, we cannot second-guess that determination any more than we could determine that a defendant who was punished as severely as they would have been for murder was "constructively" convicted of murder.

## 2. Other Circuits' Treatment of § 4A1.2(k)

We recognize that our narrow construction of § 4A1.2(k) potentially conflicts with the holdings of other circuits addressing this question. *See Glover,* 154 F.3d at 1294–95 (holding that " § 4A1.2(k) contemplates that, in calculating a defendant's ... sentence ..., the district court will aggregate any term of imprisonment imposed because of a probation violation"); *United States v. Reed,* 94 F.3d 341 (7th Cir.1996) (embracing *Glidden* ); *Glidden,* 77 F.3d at 40 (holding that when a probationer is found to have "violated probation [and in response has been] ordered ... to serve a period of incarceration, we think it proper to view that order as at least a partial revocation ... within the scope of ... § 4A1.2(k)(1).").

As an initial matter, we note that only one of the other circuits considering the question has dealt specifically with the modification versus actual revocation distinction. *See Glover,* 154 F.3d at 1294–95. In the other two cases, the probationer was resentenced to probation after the period of incarceration, *see Reed,* 94 F.3d at 342–43; *Glidden,* 77 F.3d at 39. Thus the other decisions were more closely in accord with the commonly understood meaning of revocation. In addition, none of the other cases dealt with a statute such as the temporary detention statute in this case, which explicitly creates a diversionary disposition only applicable to juveniles. *See generally,* U.S.S.G. § 4A1.2(f) (juvenile di-

---

**9.** Indeed, this is precisely how the Youth Probation officials in this case described the temporary detention procedures to which Ramirez was subjected.

versionary dispositions not counted as sentences under the Guidelines).

More importantly, none of these cases consider, either explicitly or implicitly, the constitutional requirements for revocation set out in *Morrissey.* Nor did any of the courts have the benefit of the usual definition of revocation articulated by the Supreme Court in *Johnson v. United States.*[10] The only rationale provided for their holdings is the general commentary introducing the Criminal History chapter of the Guidelines. *See Glover,* 154 F.3d at 1294; *Glidden,* 77 F.3d at 40. As discussed above, we believe that the availability of § 4A1.3 adequately addresses the concern that the failure to consider such violations will result in inadequate criminal history scores.

To the extent they are inconsistent with this opinion, we find the decisions in the other circuits treating *any* violation followed by confinement as a revocation of parole under § 4A1.2(k) to be unpersuasive. To the extent they presume that constructive revocations exist, the holdings ignore the plain language of § 4A1.2(k) and the general rule that we construe penal statutes strictly. They also fail to consider the constitutional requirements for revocation set out in *Morrissey.* Finally, the other circuits' approach does not grant sufficient deference to the reasoned determinations of parole or probation authorities, who are in a better position than subsequent courts to determine whether a particular violation is sufficiently grave to warrant revocation.

### 3. Ramirez's Parole Was Not Revoked Under Federal Law

In the instant case, neither temporary detention can be equated with a revocation of parole that could be aggregated with Ramirez's juvenile sentence under § 4A1.2(k). Indeed, both detentions were clearly ordered as *alternatives* to revoking Ramirez's parole.

■ With regard to the first violation, there has been no showing that the requirements of *Morrissey* were met. *See Johnson,* 205 F.3d at 1199–1200 (finding record insufficient to uphold finding of revocation where probationer was detained three times and no revocation hearing was ever held). There was neither a probable cause hearing nor a violation finding.[11]

■ With regard to the second temporary detention, the parole authority neither made a finding of revocation nor returned Ramirez to parole subsequent to his detention. In fact, the YOPB explicitly found that no revocation was necessary and stated that Ramirez would be better served by remaining under the supervision of parole officials. The temporary detention is thus more accurately viewed as a modification of the terms of Ramirez's parole, as opposed to a revocation. In light of the usual meaning of the term revocation, and state and federal practice, we hold that the second temporary detention does not fall within the scope of § 4A1.2(k).

In sum, we find that Ramirez's parole was never actually revoked, nor can his time in temporary detention be equated with imprisonment, as he remained under parole supervision. We therefore hold that the District Court did not err in determining that neither of the two temporary detentions ordered by YOPB consti-

---

**10.** *Johnson* was decided two years after *Glover.*

**11.** Ramirez's signed "waiver" on the CAP form was not adequate to excuse the lack of procedural due process protections accorded to him during the process.

tuted a constructive revocation of parole under § 4A1.2(k).

## IV. CONCLUSION

For the reasons discussed above, we hold that the District Court did not err in determining that neither of the two temporary detentions ordered by YOPB constituted either a prior sentence under § 4A1.1(c) or a constructive revocation of parole under § 4A1.2(k).

The judgment of the District Court is **AFFIRMED.**

CYNTHIA HOLCOMB HALL, Circuit Judge, concurring in part and dissenting in part.

I join the court's opinion with the exception of Part III(B). I respectfully dissent from the majority's conclusion that Ramirez's parole for his 1989 rape conviction was not "revoked," as that term is understood in U.S.S.G. § 4A1.2(k). I find two serious flaws in the majority opinion. First, the majority's definition, relying almost entirely on state law, is irreconcilable with one of the primary purposes of the Sentencing Guidelines, "avoiding unwarranted sentencing disparities among defendants with similar records." 28 U.S.C. § 991(b)(B). Second, the way the majority defines a "revocation of ... parole," under U.S.S.G. § 4A1.2(k), is inconsistent with the fundamental purposes and policies of chapter 4 of the Sentencing Guidelines.

The majority correctly states that the purpose of creating a *uniform federal definition* of terms within the Guidelines is to effectuate consistent nationwide application of federal legislation. *Taylor v. United States,* 495 U.S. 575, 591, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). I agree with the majority's implicit proposition that this purpose should not necessarily deter us from defining a statute in a manner that conflicts with our sister circuits.

When we do depart from our sister circuits and create our own definition of a federal statute, we should, at least, ensure that similarly situated criminal defendants *in our own circuit* are treated consistently. I fear that the majority's almost complete reliance on state law will result in the opposite.

As the majority itself notes, the "inherently flexible and discretionary nature of the different state systems, which aim to consider the totality of the parolee's history as well as the gravity of the violation, *leads to discrepancies in the type of sanctions handed down for even the same minor violations.*" Maj. Op. at 804 (emphasis added). Yet, under the majority's definition, our court must defer completely to the individual states in our circuit in determining when parole will be revoked. Thus, two criminal defendants in our Circuit who have committed the exact same criminal conduct while on parole and have received the exact same term of confinement for a violation can and will be treated differently under the majority's definition. Such an approach is inconsistent with the general purposes of the Sentencing Guidelines. *See, e.g.,* 28 U.S.C. § 991(b).

The approach is also contrary to Supreme Court precedent. In *Taylor v. United States,* the Court considered the meaning of the term "burglary" under a federal sentencing enhancement similar to the one here. 495 U.S. at 580, 110 S.Ct. 2143. The Eighth Circuit had held that "burglary ... means 'burglary' however a state chooses to define it." *Id.* The Supreme Court unanimously rejected this approach, stating that "[i]t seems to us to be implausible that Congress intended the meaning of 'burglary' for purposes of [the sentencing enhancement at issue] to depend on the definition adopted by the State of conviction." *Id.* at 590, 110 S.Ct.

2143. The Court then went on to hold that a *uniform federal definition* of burglary was necessary in order to advance the interests of the sentencing enhancement. *Id.* at 595–96, 110 S.Ct. 2143. Like the majority here, the petitioner in *Taylor* argued that the rule of lenity required the Court to define the term "burglary" according to state law. The Court rejected this argument. "This maxim of statutory construction, however, cannot dictate an implausible interpretation of a statute." *Id.* at 596, 110 S.Ct. 2143. *See also United States v. Turley,* 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957) ("[I]n the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law").

The majority justifies its decision by stating that it does not want to "usurp the discretion of the probation entity." But I do not see how defining the term "revocation" differently from the state will usurp the discretion of a probation or parole entity. A federal court's determination that a parole violation is a "parole revocation" under the Sentencing Guidelines certainly does not change the defendant's parole status under state law. Moreover, state parole officers advance the interests of the individual states when deciding whether to formally revoke parole. The interests the federal guidelines seek to advance are not necessarily considered in a state officer's decision.

I also do not believe that the majority's definition advances the purposes and policies of chapter 4 of the Guidelines. Those purposes and policies are expressly laid out in the introduction to the chapter:

A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deter-

rence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.... The specific factors included in § 4A1.1 and § 4A.1.3 are consistent with the extant empirical research assessing correlates of recidivism and patterns of career criminal behavior.

Introductory Comments to Chapter 4 of U.S.S.G. It is with these considerations in mind that we must go about interpreting the meaning of the term "revocation of probation, parole, supervised release, special parole or mandatory release." USSG § 4A1.2(k). The guidelines are concerned with parole revocations because they seek to discourage recidivism and encourage rehabilitation of convicts after release from prison. The guidelines seek to advance certain *federal interests* and it is within these federal interests that the guidelines must be interpreted. Individual states have wide and varying reasons for why they may not *formally* revoke a particular convict's parole or probation. The federal guidelines, however, are not concerned with such reasons. As the Second Circuit has declared, interpreting the term "parole revocation" to not include a parole violation plus a term of imprisonment would be "contrary to the Guidelines' premise that repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation and aggravates the need for punishment with each recurrence." *United States v. Glidden,* 77 F.3d 38, 40 (2d Cir. 1996) (per curiam).

The definition of parole revocation of the other circuits and the one that I would adopt requires two conditions be met— 1) a formal finding of violation; and 2) a

punishment of imprisonment because of such a finding.[1] I do not believe that we should adopt this definition simply because our sister circuits have adopted it. We should adopt this definition because it advances the two major objectives that chapter 4 of the Guidelines advances—consistent application and discouragement of recidivism.

Defining "parole revocation" as a formal finding of a parole violation plus a return to a term of imprisonment serves these purposes. When the state has formally found that the defendant has violated the terms of his or her parole and has furthermore deemed that violation serious enough to return the defendant to imprisonment, this demonstrates that the defendant has engaged in behavior that chapter 4 of the guidelines specifically seeks to take into account. Moreover, this definition of parole revocation is straightforward, simple to apply, and treats similarly situated defendants the same. Also, such a definition is, in my opinion, entirely consistent with the plain and intended meaning of the term parole revocation. "The essence of parole is release from prison." 59 Am. Jur.2d *Pardon and Parole* § 6 (1987). Notwithstanding the technical status of the person under state law, when a person has been returned to prison, that person is not commonly understood to still be "on parole."

The majority's reliance on Supreme Court cases dealing with the requirements that must be met under the Due Process Clause before probation or parole may be revoked are simply inapposite. The issue dealt with in those cases is not involved in this case. Ramirez *does not argue* that a finding that his parole was revoked, for purposes of the Federal Sentencing Guidelines would, *in any way*, deprive him of his federal due process rights.[2] Nor does Ramirez argue that he was not accorded due process in his parole violation proceedings.[3]

The government points to two incidents that qualify as parole revocations. If either incident does so qualify, then we must reverse because the district court could not have applied the safety valve departure. It is my opinion that the first incident does not qualify as a revocation but the second one does.

The first incident involved Ramirez's speeding ticket and positive test for mari-

---

1. *See Glidden,* 77 F.3d 38 at 40 ("[W]hen a defendant has been ... placed on probation, and the court has thereafter, upon finding he violated probation, ordered him to serve a period of incarceration, we think it proper to view that order as at least a partial revocation of parole that falls within the scope of the Guidelines § 4A1.2(k)(1)."); *United States v. Reed,* 94 F.3d 341, 342–43 (7th Cir.1996) (concluding that a "finding of a probation violation coupled with a time-served imprisonment sentence and a resentencing to probation constitutes a 'revocation of probation'"); *United States v. Glover,* 154 F.3d 1291, 1294 (11th Cir.1998) (U.S.S.G. "§ 4A1.2(k)(1) contemplates that, in calculating a defendant's total sentence of imprisonment for a particular offense, the district court will aggregate any term of imprisonment imposed because of a probation violation with the defendant's original sentence of imprisonment, if any, for that offense.").

2. The majority's statements that, under pre-Guidelines practice, a probationer may not have his probation reinstated following revocation without a formal resentencing process have little to do with this case. Maj. Op. at 802–803 & 804. Ramirez was not sentenced to probation but was paroled before serving his entire sentence of imprisonment.

3. As noted below, when the Parole Board formally charged Ramirez with violating his parole, he was given the right to a hearing, the right to an attorney, and the right to call witnesses in his own defense. Ramirez waived those rights and admitted to the violation. Ramirez does not argue that his waiver was constitutionally deficient.

juana use. After Ramirez and his parole officer agreed to a corrective action plan (CAP), he spent thirty days in county jail. Ramirez was therefore returned to imprisonment. But there never appeared to be any formal finding of violation. The parole board signed off on the plan without ever saying there was probable cause for the parole officer's determination or that there was an express violation. So the problem with Ramirez's first incident is that it meets the second requirement, return to imprisonment, but fails the first, a finding of violation.

The second incident involved Ramirez's being caught with a knife. Here, there is no doubt that there was an express finding of violation. Rather than coming from a CAP, here the allegations came from an allegation form that Ramirez had to answer. The board expressly found probable cause and ordered a hearing where Ramirez had a right to an attorney and a right to call witnesses in his favor. No hearing was held because Ramirez waived his right to such a hearing.[4] The board then *formally determined* that Ramirez violated his parole. The board ordered Ramirez to serve forty-five days in a juvenile confinement facility, similar to the one where Ramirez served four years of his fourteen year sentence pursuant to his rape conviction. The second incident therefore was a revocation of his parole—there was a formal finding of violation and a punishment of imprisonment for this violation.[5]

Since Ramirez's parole was revoked, as those terms are understood in the Sentencing Guidelines, I would vacate Ra-

mirez's sentence and remand for resentencing.

I respectfully dissent.

---

4. Ramirez's waiver seems to have been fully voluntary.

5. Ramirez spent thirty days in county jail and forty-five days in a juvenile confinement facility. He was not free to leave either facility and was therefore deprived of his liberty by the state. Any contention that Ramirez was not "imprisoned" is simply wrong. *See Black's Law Dictionary* 757 (6th ed.1990) (defining "imprisonment" as the "detention of a person contrary to his will.").